UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

LARRY WALKER,

                Petitioner,              Case No. 1:23-cv-782

v.                                Honorable Hala Y. Jarbou

CHRIS KING,

                Respondent.

_____/

**OPINION**

This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Petitioner Larry Walker is incarcerated with the Michigan Department of Corrections at the Earnest C. Brooks Correctional Facility in Muskegon Heights, Muskegon County, Michigan. On June 25, 2018, following a jury trial in the Macomb County Circuit Court, Petitioner was convicted of second-degree murder, in violation of Mich. Comp. Laws § 750.317, and possession of a firearm during the commission of a felony (felony-firearm), in violation of Mich. Comp. Laws § 750.227b. On August 15, 2018, the court sentenced Petitioner to 30 to 50 years' incarceration for the murder conviction, to be served consecutively to a term of 2 years' incarceration for the felony-firearm conviction.

Petitioner contends that he is held in custody in violation of his constitutional rights. For the reasons set forth below, the Court concludes that Petitioner has failed to set forth a meritorious ground for habeas relief and will, therefore, deny his petition for writ of habeas corpus.

## I.    Factual Allegations and Procedural History

The Michigan Court of Appeals described the facts underlying Petitioner's convictions as

follows:

> [Petitioner's] convictions arise from the April 24, 2017 shooting death of 16-year-old Kenneth Cutts, Jr., in Warren, Michigan. Cedric Smith-Cole, then 17 years old, lived on Paige Avenue in Warren, and was good friends with Cutts. Smith-Cole testified that on April 22, 2017, he (Smith-Cole) was involved in a fight with [Petitioner] and [Petitioner's] friend, Anthony Nelson. Nelson's house was located on Paige, just west of McArthur, and [Petitioner] was at Nelson's home on April 24, 2017.
>
> Smith-Cole testified that on April 24, 2017, Cutts was walking over to Smith-Cole's house, which was located east of McArthur Blvd., and it was their usual practice for Smith-Cole to meet Cutts at the nearby corner of Paige and McArthur. Smith-Cole testified that after Cutts passed Nelson's house on the way to McArthur, [Petitioner] appeared behind Cutts. Apparently, Cutts owed [Petitioner] $10 for a prior purchase of marijuana from [Petitioner]. When Smith-Cole notified Cutts of [Petitioner's] presence, Cutts turned around and words were exchanged. [Petitioner] purportedly drew a gun from his pants and tapped it toward Cutts's head. Cutts then tried to wrestle the gun away, but when he failed to do so, he ran away toward Smith-Cole. Smith-Cole said that [Petitioner] pointed the gun and squinted his eye as if trying to aim, and fired a shot. The shot struck Cutts in the back of the neck and the bullet exited through his mouth, resulting in his death. [Petitioner] then picked up the shell casing from the spent bullet and ran away.
>
> [Petitioner] testified to a different version of events. He denied fighting with Smith-Cole on April 22, 2017. He stated that on April 24, 2017, he was at Nelson's house for a barbeque. At some point, he left to walk to the store by heading east along Paige. According to [Petitioner], when he got past McArthur, he saw Smith-Cole ahead of him, approaching. Just then, although [Petitioner] did not know who it was at the time, Cutts jumped him from behind and placed a choke hold on him. While [Petitioner] was being choked, Smith-Cole tried to go through [Petitioner's] pockets. [Petitioner] tried to break free from the choke hold while simultaneously trying to fend off Smith-Cole. At some point, Smith-Cole felt the gun in [Petitioner's] pocket and started to run away. Right then, [Petitioner] pulled the gun out from his pocket, spun around to get Cutts off of him, and fired a single shot. [Petitioner] claimed, "I didn't see him. I just shot. I just spint [sic] and shot." But he also stated, "I saw him you know, I shot so fast, and I kept running."
>
> Afterward, [Petitioner] made his way to a nearby home on Essex Avenue, which was a few blocks north of Paige. There, he obtained a change of clothes and asked a person there to dispose of some bullets, but the person refused. [Petitioner] left and later went to a house located at 20100 Concord in Detroit. After tracking

2

[Petitioner's] location with cell phone data, the police found him at the Concord house hiding in a dryer in the basement.

Although [Petitioner] was charged with first-degree premeditated murder, the jury convicted him of the lesser included offense of second-degree murder, as well as felony-firearm, and this appeal followed.

*People v. Walker*, No. 345294, 2020 WL 1046699, at *1–2 (Mich. Ct. App. Mar. 3, 2020).

The jurors heard testimony from several prosecution witnesses during the first three days of the five-day trial, including: Kenneth Cutts Jr.'s mother; Cedric Smith-Cole's mother; Cedric; a resident of one of the homes Petitioner stopped at during his flight from the scene of the shooting; seven police officers who responded to the scene, hunted for Petitioner, or otherwise participated in the investigation; the forensic pathologist who conducted the autopsy on the victim; and two forensic scientists who tested physical evidence relating to the case. (Trial Tr. I, II, III, ECF Nos. 41-10, 41-11, 41-12.) The jurors also heard testimony from Petitioner, three additional police officers, and one evidence technician as part of Petitioner's defense. (Trial Tr. III, IV, ECF Nos. 41-12, 41-134.) Two witnesses that Petitioner intended to call, Anthony Nelson and Doug Draper, failed to appear for trial. (Trial Tr. IV, ECF No. 41-14, PageID.2348–2353.) The jurors heard closing arguments and instructions on the fourth day of trial and returned their verdict the following morning: not guilty of first-degree murder but guilty of second-degree murder and felony-firearm. (Trial Tr. V, ECF No. 41-15, PageID.2522–2523.)

After Petitioner was sentenced, he directly appealed his convictions raising three issues by way of a brief filed with the assistance of counsel, (Pet'r's App. Br., ECF No. 41-21, PageID.2965–2990), and several issues by way of a *pro per* supplemental brief, (Pet'r's Am. Pro Per Suppl. Br.,

ECF No. 41-17, PageID.2659–2701; ECF No. 41-18, PageID.2702–2718).[1] By opinion issued March 3, 2020, the Michigan Court of Appeals affirmed the trial court. *Walker*, 2020 WL 1046699, at *1. Petitioner then filed a *pro per* application for leave to appeal in the Michigan Supreme Court. Once again, Petitioner filed multiple handwritten amendments, affidavits, and motions spanning hundreds of pages. The Michigan Supreme Court denied leave by order entered December 20, 2020. *People v. Walker*, 951 N.W.2d 904 (Mich. 2020).

Petitioner returned to the trial court and filed a motion for relief from judgment on November 17, 2021. (Macomb Cnty. Cir. Ct. Register of Actions, ECF No. 41-1, PageID.1424–1427). Petitioner amended that motion and filed several additional requests for relief. (*Id*.) By order entered December 22, 2021, the trial court denied the amended motion for relief from judgment. (*Id*.) By opinion and order entered June 1, 2022, the trial court denied the various motions for reconsideration that followed. (*Id*.) The trial court concluded that Petitioner had already raised his collateral attack issues on direct appeal and that the issues had been decided against him. (Macomb Cnty. Cir. Ct. Op. & Order, ECF No. 42-8, PageID.4342–4345; Macomb Cnty. Cir. Ct. Op. & Order, ECF No. 42-12, PageID.4729–4731.)

Petitioner then sought leave to appeal to the Michigan Court of Appeals. Petitioner filed more than 2,000 pages of documents with the appellate court, most of which were, once again, various briefs, amendments, affidavits, and motions for special relief. By order entered October 27, 2022, the Michigan Court of Appeals denied Petitioner's application for leave to appeal, (Mich. Ct. App. Order, ECF No. 42-8, PageID.4285), and his motion for reconsideration, (Mich. Ct. App. Order, ECF No. 42-8, PageID.4246). Petitioner filed an application for leave to appeal that

---

[1] The Michigan Court of Appeals docket includes hundreds and hundreds of pages of various amended versions of Petitioner's handwritten *pro per* supplemental briefs. (*See* ECF Nos. 41-17, 41-18, 41-19, 41-20, 41-21, 41-22, 42-1, 42-2, 42-3.)

decision to the Michigan Supreme Court. The court denied leave by order entered March 6, 2023. *People v. Walker*, 985 N.W.2d 527 (2023).

Petitioner filed his initial petition in this matter on July 24, 2023. (ECF No. 1.) Petitioner has produced a flurry of handwritten petitions, briefs, motions, and affidavits in this Court just as he did in the Michigan appellate courts. The record in this Court already consists of more than 8,000 pages, most of which have been handwritten by Petitioner. The operative petition now before this Court is Petitioner's November 7, 2023, second amended petition. (ECF No. 36.) Petitioner has supported that petition with a brief. (ECF No. 37.) The second amended petition and brief supersede all of the petitions, briefs, and supplements filed before November 7, 2023. The Court will consider Petitioner's second amended petition and brief. The Court will not consider Petitioner's superseded filings.

The second amended petition raises the following claims:

I.    [Sixth Amendment] autonomy and agency claim implicating [trial counsel's] opening argument.

II.   [Sixth Amendment] autonomy claim implicating [trial counsel's] refusal to advocate voluntary manslaughter concession strategy.

III.  [Sixth Amendment] autonomy claim implicating [trial counsel's] refusal to request voluntary manslaughter[] jury instructions.

IV.   [Fourteenth Amendment] judicial bias claim.

V.    [Sixth and Fourteenth] Amendment ineffective assistance of appellate counsel claims for counsel refusing to move to have record corrected and arguing issue #2 of A.E. #58[2] rather than either one of or all of the autonomy claims in Claims #1–3 above.

---

[2] Petitioner employs his own numbering regimen to identify the exhibits upon which he relies. Indeed, since filing the operative petition and brief, Petitioner has filed a number of exhibits. (ECF Nos. 46, 48, 50). The exhibits Petitioner has filed or referenced appear to be excerpts of materials already present in the complete Rule 5 materials filed by Respondent. For that reason, the Court will rely on the materials as they appear in the Rule 5 materials rather than Petitioner's duplicative exhibits.

VI.     [Sixth and Fourteenth] Amendment ineffective assistance of trial counsel claim due to [trial counsel's] failure to present evidence referenced in STM #140–170 of petition in connection to voluntary manslaughter concession strategy rather than arguing self-defense.

VII.    [Sixth and Fourteenth] Amendment ineffective assistance of trial counsel claim due to [trial counsel's] failure to present evidence referenced in STM #140–170 of petition in connection to jury instructions on voluntary manslaughter rather than charges on self-defense and second-degree murder.

VIII.   [Sixth and Fourteenth] Amendment ineffectiveness of appellate counsel claim due to counsel's refusal to move to correct record and for arguing issue #1 of A.E. #58 rather than claims in Claims #6–7 above.

IX.     [Sixth and Fourteenth] Amendment right to be present claim.

X.      [Sixth and Fourteenth] Amendment ineffectiveness of appellate counsel claim due to counsel refusing to move to have record corrected and arguing issue #2 of A.E. #58 rather than Claim #9 above.

XI.     [Sixth and Fourteenth] Amendment non-forfeiture of jury instructions on heat of passion/malice.

XII.    [Sixth and Fourteenth] Amendment ineffectiveness of appellate counsel claim due to counsel's refusal to move to correct record and arguing issue #2 of A.E. #58 rather than Claim #11 above.

XIII.   [Sixth and Fourteenth] Amendment ineffective assistance of trial counsel claim for counsel's failure to object to scoring of OV 5 at 15 points.

XIV.    [Sixth and Fourteenth] Amendment ineffectiveness of appellate counsel for counsel failing to object to trial counsel not objecting scoring of OV 5 at 15 points [rather] than other sentencing challenges.

XV.     [Fourteenth] Amendment actual innocence claim.

(Second Am. Pet., ECF No. 36, PageID.1143–1147.) Respondent distills Petitioner's fifteen grounds down to six and argues that the grounds are unexhausted, procedurally defaulted, and/or meritless. (Answer in Opp'n to Pet., ECF No. 38.) Petitioner has replied to Respondent's answer (ECF No. 59) and filed a supporting brief (ECF No. 60).

## II.    Pending Motions

Since Petitioner filed his response, he has filed various motions, briefs, and supplements.

6

Petitioner asks the Court to conduct an evidentiary hearing, (ECF Nos. 66, 67), and to expand the record (ECF Nos. 68, 69). Generally, habeas corpus actions are determined on the basis of the record made in the state court. *See* Rule 8, Rules Governing § 2254 Cases. An evidentiary hearing in the district court is not mandatory unless one of the circumstances listed in 28 U.S.C. § 2254(e)(2) is present. *See Sanders v. Freeman*, 221 F.3d 846, 852 (6th Cir. 2000). Having conducted a plenary review of the state record, the Court finds that the record and state-court findings are adequate under § 2254(e). Thus, no evidentiary hearing will be conducted. Accordingly, Petitioner's motion for an evidentiary hearing and to expand the record will be denied.

Petitioner also moves for partial summary judgment on one of his "autonomy" claims. (ECF Nos. 70, 71, 81, 82.) As set forth fully below, Petitioner's autonomy claims lack merit. Accordingly, the Court will deny Petitioner's motions for partial summary judgment. Petitioner asked the Court to withdraw his first motion for partial summary judgment in favor of this corrected motion for partial summary judgment. (ECF Nos. 79, 80.) That motion will be denied because the Court has considered and will deny Petitioner's motion as originally presented and in its corrected form.

Petitioner asks the Court to order Respondent to provide Petitioner a copy of all of the Rule 5 materials. (ECF Nos. 72, 73.) The Rule 5 materials in this case span more than 5,000 pages—not because of voluminous transcripts, but because Petitioner filed hundreds and hundreds of pages of repetitive briefs, motions, and amendments. "Rule 5 of the Rules Governing Section 2254 Cases does not entitle [Petitioner] to a free copy of the entire state court record; it requires only that the respondent provide certain documents, including 'parts of the transcript that the respondent considers relevant.' See Rules Governing Section 2254 Cases, Rule 5(c)." *Bonomelli*

*v. Dinwiddie*, No. CIV-07-212-D, 2008 WL 5059814, at *1 (W.D. Okla., Nov. 21, 2008). Accordingly, the Court will deny Petitioner's motion.

Petitioner next asks the Court to permit him to exceed the page limitation for motions and briefs. (ECF Nos. 77, 78.) The Court will deny Petitioner's motion as unnecessary; the Court has considered every page of each of Petitioner's submissions to the Court.

Petitioner seeks release on bond pending the Court's decision on his petition. (ECF Nos. 88, 89, 90.) As set forth fully below, the issues raised in the habeas petition lack merit. Accordingly, Petitioner's motion for immediate release will be denied.

Finally, Petitioner asks the Court to enter a default and default judgment against Respondent with respect to the first three issues raised in the second amended habeas petition. Petitioner contends that Respondent failed to address those three "autonomy" claims and, therefore, Petitioner is entitled to default judgment, (ECF Nos. 91, 92, 93, 94, 97), and a writ of habeas corpus ordering his immediate release, (ECF Nos. 98, 99). Petitioner is simply wrong. As the Sixth Circuit explained in *Brown v. United States*, No. 20-5090, 2020 WL 10054086 (6th Cir. Nov. 25, 2020):

> "Default judgments in habeas corpus proceedings are not available as a procedure to empty State prisons without evidentiary hearings." *Allen v. Perini*, 424 F.2d 134, 138 (6th Cir. 1970). "The burden to show that he is in custody in violation of the Constitution of the United States is on the prisoner." *Id*. No matter the quality of the Government's responses, "the District Court was obligated to decide the case on its merits." *Id*.

*Brown*, 2020 WL 10054086, at *5. Accordingly, Petitioner's motions relating to default and default judgment and for immediate release will be denied.

## III.  Exhaustion and Procedural Default (Habeas Grounds XI, XII, and XIII)

Before the Court may grant habeas relief to a state prisoner, the prisoner must exhaust remedies available in the state courts. 28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S.

838, 842 (1999). Exhaustion requires a petitioner to "fairly present" federal claims so that state courts have a "fair opportunity" to apply controlling legal principles to the facts bearing upon a petitioner's constitutional claim. *Id.* at 844, 848; *see also Picard v. Connor*, 404 U.S. 270, 275–77 (1971); *Duncan v. Henry*, 513 U.S. 364, 365 (1995); *Anderson v. Harless*, 459 U.S. 4, 6 (1982). To fulfill the exhaustion requirement, a petitioner must have fairly presented his federal claims to all levels of the state appellate system, including the state's highest court. *O'Sullivan*, 526 U.S. at 845; *Wagner v. Smith*, 581 F.3d 410, 414 (6th Cir. 2009). "To satisfy the presentation requirement, the petitioner must have argued the claim's factual and legal basis at each level of the state court system." *Whitman v. Gray*, 103 F.4th 1235, 1238 (6th Cir. 2024) (citing *Wagner*, 581 F.3d at 414–15).

Petitioner bears the burden of showing exhaustion. *See Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994). Petitioner contends that he raised all of his habeas issues at all levels of the Michigan courts. If so, all of his habeas issues are ripe for consideration by this Court.

Respondent, on the other hand, contends that Petitioner has not raised all of his habeas grounds at all levels of the Michigan courts, and therefore, Petitioner has not fairly presented the issues to the state courts. If that is so, those claims remain unexhausted and Petitioner's failure to exhaust would preclude granting habeas relief.

Even if Petitioner has failed to exhaust some of his habeas claims, it is possible that Petitioner's failure would not preclude the Court from granting relief on those grounds. As the Sixth Circuit explained in *Rust v. Zent*:

> [Failure to e]xhaust[] is a problem only if the state still provides a remedy for the habeas petitioner to pursue, thus providing the state courts an opportunity to correct a constitutionally infirm state court conviction. If no remedy exists, and the substance of a claim has not been presented to the state courts, no exhaustion problem exists; rather, it is a problem of determining whether cause and prejudice exist to excuse the failure to present the claim in the state courts.

17 F.3d at 160. Michigan provides one post-direct-appeal procedure for attacking convictions or sentences: a motion for relief from judgment under Mich. Ct. R. 6.502.[3] Under Michigan law, one such motion may be filed after August 1, 1995. Mich. Ct. R. 6.502(G)(1). Petitioner has already filed one such motion. The Court concludes, therefore, that, to the extent that Petitioner has failed to exhaust any of his claims, he no longer has an available state court remedy. If no further state remedy is available to Petitioner, his failure to exhaust does not bar consideration of his unexhausted claims; but the claim is procedurally defaulted. *Rust*, 17 F.3d at 160.

When a petitioner has procedurally defaulted his claims, the federal habeas court will only entertain the defaulted issue if the petitioner can show "cause" for the procedural default and "actual prejudice" as result of the alleged federal violation or can show actual innocence. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Lucas v. O'Dea*, 179 F.3d 412, 418 (6th Cir. 1999); *Rust*, 17 F.3d at 160–61. To show cause sufficient to excuse a failure to raise claims on direct appeal, Petitioner must point to "some objective factor external to the defense" that prevented him from raising the issue. *Murray*, 477 U.S. at 488; *see McCleskey v. Zant*, 499 U.S. 467, 497 (1991).[4]

Petitioner contends that he can demonstrate cause: his appellate counsel rendered ineffective assistance by failing to include these issues in Petitioner's direct appeal. Many of the

---

[3] *See, e.g.*, *People v. Kincade*, 522 N.W.2d 880, 882 (Mich. Ct. App. 1994) (stating "Defendant's postappeal motions for a new trial . . . were reviewable only as motions for relief from judgment pursuant to MCR 6.501 et seq"); *People v. Watroba*, 483 N.W.2d 441, 442 (Mich. Ct. App. 1992) ("Subchapter 6.500 of the Michigan Court Rules establishes the procedures for pursuing postappeal relief from a criminal conviction. The subchapter is the exclusive means to challenge a conviction in Michigan once a defendant has exhausted the normal appellate process.").

[4] Factors that may establish cause include "'interference by officials,' attorney error rising to the level of ineffective assistance of counsel, and 'a showing that the factual or legal basis for a claim was not reasonably available.'" *Cvijetinovic v. Eberlin*, 617 F.3d 833, 837 (6th Cir. 2010) (citing *Hargrave-Thomas v. Yukins*, 374 F.3d 383, 388 (6th Cir. 2004)).

improperly foregone issues, in turn, are ineffective assistance of trial counsel claims. Assessing whether or not there is cause will ultimately turn on the merits of Petitioner's ineffective assistance of counsel claims.

A habeas corpus petition "may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." *See* 28 U.S.C. § 2254(b)(2). Furthermore, the Supreme Court has held that federal courts are not required to address a procedural default issue before deciding against the petitioner on the merits. *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."); *see also Overton v. Macauley*, 822 F. App'x 341, 345 (6th Cir. 2020) ("Although procedural default often appears as a preliminary question, we may decide the merits first."); *Hudson v. Jones*, 351 F.3d 212, 215–16 (6th Cir. 2003) (citing *Lambrix*, 520 U.S. at 525; *Nobles v. Johnson*, 127 F.3d 409, 423–24 (5th Cir. 1997); 28 U.S.C. § 2254(b)(2)). Here, rather than conducting a lengthy inquiry into exhaustion and procedural default, judicial economy favors proceeding directly to a discussion of the merits of Petitioner's claims.

## IV.    AEDPA standard

The AEDPA "prevent[s] federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693–94 (2002). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."

11

28 U.S.C. § 2254(d). "Under these rules, [a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Stermer v. Warren*, 959 F.3d 704, 721 (6th Cir. 2020) (internal quotation marks omitted) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Williams v. Taylor*, 529 U.S. 362, 381–82 (2000); *Miller v. Straub*, 299 F.3d 570, 578–79 (6th Cir. 2002). Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 565 U.S. 34, 37–38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405–06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 575 U.S. at 316 (quoting *Harrington*, 562 U.S. at 103).

Determining whether a rule application was unreasonable depends on the rule's specificity. *Stermer*, 959 F.3d at 721. "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough*, 541 U.S. at 664. "[W]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. 415, 424 (2014) (internal quotation marks omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey v. Mitchell*, 271 F.3d 652, 656 (6th Cir. 2001). This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546–547 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

Section 2254(d) limits the facts a court may consider on habeas review. The federal court is not free to consider any possible factual source. The reviewing court "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011). "If a review of the state court record shows that additional fact-finding was required under clearly established federal law or that the state court's factual determination was unreasonable, the requirements of § 2254(d) are satisfied and the federal court can review the underlying claim on its merits. *Stermer*, 959 F.3d at 721 (citing, *inter alia*, *Brumfield v. Cain*, 576 U.S. 305 (2015), and *Panetti v. Quarterman*, 551 U.S. 930, 954 (2007)).

If the petitioner "satisfies the heightened requirements of § 2254(d), or if the petitioner's claim was never 'adjudicated on the merits' by a state court, 28 U.S.C. § 2254(d),"—for example,

if he procedurally defaulted the claim—"AEDPA deference no longer applies." *Stermer*, 959 F.3d at 721. Then, the petitioner's claim is reviewed *de novo*. *Id*. (citing *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003)).

## V.    Discussion

### A.    Actual Innocence (Habeas Ground XV)

Although establishing "cause and prejudice" is one way to avoid a procedural default bar, Petitioner could also avoid the procedural default bar by showing that he is actually innocent. In *Schlup v. Delo*, 513 U.S. 298 (1995), the Supreme Court explained this exception to the procedural default bar as follows:

> Because Schlup has been unable to establish "cause and prejudice" sufficient to excuse his failure to present his evidence in support of his first federal petition, *see McCleskey v. Zant*, 499 U.S. 467, 493–494, 111 S.Ct. 1454, 1469–1470, 113 L.Ed.2d 517 (1991), Schlup may obtain review of his constitutional claims only if he falls within the "narrow class of cases . . . implicating a fundamental miscarriage of justice," *id*., at 494, 111 S.Ct., at 1470. Schlup's claim of innocence is offered only to bring him within this "narrow class of cases."

*Schlup*, 513 U.S. at 314–15 (footnote omitted). The actual innocence claim in *Schlup* is "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Id*. at 315 (citing *Herrera v. Collins*, 506 U.S. 390, 404 (1993).

In *Herrera*, the Supreme Court determined that there is no federally cognizable stand-alone actual innocence claim. 506 U.S. at 400 (holding that "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding"). But the *Herrera* Court did not close the door completely, stating in dicta: "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to

process such a claim." *Id*. at 417.[5] Thus, even without the occurrence of any independent constitutional violation during the state criminal proceeding, federal habeas relief might be warranted for "truly persuasive demonstration of actual innocence," provided: (1) the habeas petition seeks relief in a capital case, in which case such a demonstration of actual innocence "would render the execution of a defendant unconstitutional"; and (2) there is "no state avenue open to process such a claim." *Id*. The Supreme Court emphasized that "the threshold showing for such an assumed right would necessarily be extraordinarily high." *Id*.; *see also House v. Bell*, 547 U.S. 518, 555 (2006) ("In *Herrera*, however, the Court described the threshold for any hypothetical freestanding innocence claim as 'extraordinarily high.'"); *Cress v. Palmer*, 484 F.3d 844, 854–55 (6th Cir. 2007).

This is not a capital case. The *Herrera* exception does not apply. Petitioner's claim of actual innocence as a stand-alone claim is not cognizable on habeas review.

Even considered as a gateway to overcoming a procedural default, Petitioner's actual innocence claim would fail. "'[A]ctual innocence' means factual innocence." *Bousley v. United States*, 523 U.S. 614, 623 (1998). In order to make a showing of actual innocence under *Schlup*, a Petitioner must present new evidence showing that "it is more likely than not that no reasonable juror would have convicted [the petitioner.]" *McQuiggin v. Perkins*, 569 U.S. 383, 399 (2013) (quoting S*chlup*, 513 U.S. at 327) (addressing actual innocence as an exception to procedural default). Petitioner cannot make that showing because he admits he was guilty of voluntary manslaughter. It is beyond debate that a petitioner acknowledging guilt of a lesser degree of homicide is not actually innocent. *Taylor v. Winn*, No. 20-1359, 2020 WL 4334125, at *3 (6th Cir.

---

[5] The Supreme Court creates exceptions for capital cases "because of the qualitative difference between death and all other penalties[,]" including "mandatory life in prison without parole." *Harmelin v. Michigan*, 501 U.S. 957, 995 (1991).

July 13, 2020) (citing *Harvey v Jones*, 179 F. App'x 294, 298–99 (6th Cir. 2006); *Rozzelle v. Sec'y, Fla. Dep't of Corr.*, 672 F.3d 1000, 1015–17 (11th Cir. 2012)).

For all of these reasons, Petitioner's actual innocence claim does not entitle him to habeas relief.

## B.    Violations of Petitioner's Autonomy (Habeas Grounds I, II, and III)[6]

Petitioner's first three habeas grounds focus on counsel's decision to pursue a defense of self-defense and to not argue that Petitioner shot the victim because Petitioner was provoked to an uncontrollable rage such that he committed, at most, voluntary manslaughter rather than murder. Petitioner claims that counsel specifically ignored Petitioner's requests to concede culpability for manslaughter. Petitioner claims that counsel violated Petitioner's right to control his defense against the charges—his right to autonomy as outlined in *McCoy v. Louisiana*, 584 U.S. 414 (2018):

> In the case now before us . . . the defendant vociferously insisted that he did not engage in the charged acts and adamantly objected to any admission of guilt. App. 286–287, 505–506. Yet the trial court permitted counsel, at the guilt phase of a capital trial, to tell the jury the defendant "committed three murders . . . . [H]e's guilty." *Id.*, at 509, 510. We hold that a defendant has the right to insist that counsel refrain from admitting guilt, even when counsel's experienced-based view is that confessing guilt offers the defendant the best chance to avoid the death penalty.

---

[6] The Court reviews Petitioner's autonomy arguments *de novo*. Petitioner raised the arguments for the first time in his motion for relief from judgment. The trial court denied the motion on the ground that Petitioner had previously raised the issue and it had been decided against him. The Court cannot find any record support for that determination. Petitioner had raised, and the appellate court addressed, Petitioner's claims that counsel rendered ineffective assistance with regard to concessions in arguments, failure to object to instructions, and failure to request a voluntary manslaughter instruction. The ineffective assistance claims, however, are entirely separate from the autonomy claims. Put differently, counsel's decisions might be entirely consistent with the requirement of effective assistance, but if the decisions encroach upon the defendant's prerogative, the decisions might still be unconstitutional. Accordingly, the Court concludes that either (a) the trial court did not consider or resolve Petitioner's autonomy arguments or (b) the trial court's determination that the autonomy arguments had been raised and decided against Petitioner is an unreasonable determination of the facts on this record. Either way, this Court's review of the issue is *de novo*.

> Guaranteeing a defendant the right "to have the Assistance of Counsel for his defence," the Sixth Amendment so demands. With individual liberty—and, in capital cases, life—at stake, it is the defendant's prerogative, not counsel's, to decide on the objective of his defense: to admit guilt in the hope of gaining mercy at the sentencing stage, or to maintain his innocence, leaving it to the State to prove his guilt beyond a reasonable doubt.

*McCoy*, 584 U.S. at 417–18.

But Petitioner overstates the scope of the autonomy right. The *McCoy* Court explained further:

> The Sixth Amendment guarantees to each criminal defendant "the Assistance of Counsel for his defence." . . . As this Court explained, "[t]he right to defend is personal," and a defendant's choice in exercising that right "must be honored out of 'that respect for the individual which is the lifeblood of the law.'" [*Faretta v. California*, 422 U.S. 806, 834 (1975)] (quoting *Illinois v. Allen*, 397 U.S. 337, 350–351 (1970) (Brennan, J., concurring)); *see McKaskle v. Wiggins*, 465 U.S. 168, 176–177 (1984) ("The right to appear *pro se* exists to affirm the dignity and autonomy of the accused.").

> The choice is not all or nothing: To gain assistance, a defendant need not surrender control entirely to counsel. For the Sixth Amendment, in "grant[ing] to the accused personally the right to make his defense," "speaks of the 'assistance' of counsel, and an assistant, however expert, is still an assistant." *Faretta*, 422 U.S., at 819–820; *see Gannett Co. v. DePasquale*, 443 U.S. 368, 382, n. 10 (1979) (the Sixth Amendment "contemplat[es] a norm in which the accused, and not a lawyer, is master of his own defense"). Trial management is the lawyer's province: Counsel provides his or her assistance by making decisions such as "what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence." *Gonzalez v. United States*, 553 U.S. 242, 248 (2008) (internal quotation marks and citations omitted). Some decisions, however, are reserved for the client—notably, whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal. *See Jones v. Barnes*, 463 U.S. 745, 751 (1983).

*McCoy*, 584 U.S. at 421–22 (parallel citations omitted).

Petitioner attempts to cast counsel's decisions as decisions that fall within the confines of the decisions reserved to Petitioner, specifically, whether to plead guilty. Petitioner argues that counsel's opening argument, counsel's refusal to pursue a voluntary manslaughter concession strategy, and counsel's refusal to request voluntary manslaughter instructions deprived Petitioner

of his autonomy to plead guilty to voluntary manslaughter. (2nd Am. Pet., ECF No. 36, PageID.143; Pet'r's Br., ECF No. 37, PageID.1245–1266.) Essentially, Petitioner contends that he wanted to maintain his innocence of first-degree murder and second-degree murder, but concede his guilt to voluntary manslaughter.

That contention uses the terminology of *McCoy*, but Petitioner's situation is nothing like McCoy's. McCoy "insisted that he did not engage in the charged acts and adamantly objected to any admission of guilt." *McCoy*, 584 U.S. at 417. Petitioner, on the other hand, admits that he did engage in the charged act—shooting the victim and causing his death—but contends it was not the product of malicious intent. Instead, Petitioner claims, it was the consequence of a rage provoked by the victim. The practical difference between those two positions is highlighted by a review of Michigan law regarding criminal culpability for killing another.

It is the prerogative of the state to define the elements of the crime and that definition binds the federal courts. *See Johnson v. United States*, 559 U.S. 133, 138 (2010) ("We are, however, bound by the Florida Supreme Court's interpretation of state law, including its determination of the elements . . . ."); *Jackson v. Virginia,* 443 U.S. 307, 324 n.16 (1979) ("The respondents have suggested that this constitutional standard will invite intrusions upon the power of the States to define criminal offenses. Quite to the contrary, the standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law."). Although the Due Process Clause guarantees criminal defendants a meaningful opportunity to present a complete defense, *California v. Trombetta*, 467 U.S. 479, 485 (1984), it is also the prerogative of the state to define whether or not a defense applies to a particular crime. *See Foucha v. Louisiana*, 504 U.S. 71, 96 (1992) (acknowledging "the general rule that the definition of both crimes and defenses is a matter of state law . . . ."); *Gimotty v. Elo*, 40 F. App'x 29, 32 (6th Cir. 2002) ("States are free to

define the elements of, and defenses to, crimes. . . . In determining whether a petitioner was entitled to a defense under state law, federal courts must defer to state-court interpretations of the state's laws . . . .").

Here, Petitioner was charged with first-degree murder, Mich. Comp. Laws § 750.316, he was convicted of second-degree murder, Mich. Comp. Laws § 750.317, and he contends that he should have been convicted of voluntary manslaughter Mich. Comp. Laws § 750.321. But those statutes do not define the elements of the crimes.

Section 750.316 of the Michigan Compiled Laws states that three types of conduct constitute first-degree murder:

> (a) Murder perpetrated by means of poison, lying in wait, or any other willful, deliberate, and premeditated killing.
>
> (b) Murder committed in the perpetration of, or attempt to perpetrate [certain listed felonies].
>
> (c) A murder of a peace officer or a corrections officer committed while the peace officer or corrections officer is lawfully engaged in the performance of any of his or her duties as a peace officer or corrections officer, knowing that the peace officer or corrections officer is a peace officer or corrections officer engaged in the performance of his or her duty as a peace officer or corrections officer.

Mich. Comp. Laws § 750.316. All other kinds of murder are second-degree murder. Mich. Comp. Laws § 750.317. "Murder," however, is not defined in the Michigan statutes.

The Michigan Supreme Court has explained that "murder," as used in the statute, is defined by the common law at the time of codification. *People v. Riddle*, 649 N.W.2d 30, 37–38 (Mich. 2002). The *Riddle* court explained:

> [W]here [a legislature] borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed.

*Id.* at 38. The "cluster of ideas" attached to murder also includes the common-law defenses. *Id.* Thus, the concept of murder, as contemplated by the Michigan statute, is animated by the common law.

The common law regarding murder and manslaughter is distilled into Michigan's model criminal jury instructions. Based on the instructions, the "cluster of ideas" that make up first-degree premeditated murder are as follows:

> First, that the defendant caused the death of [name deceased], that is, that [name deceased] died as a result of [state alleged act causing death].
>
> Second, that the defendant intended to kill [name deceased].
>
> Third, that this intent to kill was premeditated, that is, thought out beforehand.
>
> Fourth, that the killing was deliberate, which means that the defendant considered the pros and cons of the killing and thought about and chose [his / her] actions before [he / she] did it. There must have been real and substantial reflection for long enough to give a reasonable person a chance to think twice about the intent to kill. The law does not say how much time is needed. It is for you to decide if enough time passed under the circumstances of this case. The killing cannot be the result of a sudden impulse without thought or reflection.
>
> [Fifth, that the killing was not justified, excused, or done under circumstances that reduce it to a lesser crime.][4]
>
>             \* \* \*
>
> [4] [The fifth item] may be omitted if there is no evidence of justification or excuse, and the jury is not being instructed on manslaughter or any offense less than manslaughter. Justification or excuse instructions may be inserted here, but they are more commonly given at a later time.

Mich. Model Crim. Jury Instr. 16.1 (footnotes 2 and 3 omitted). Second-degree murder includes some of the same elements:[7]

---

[7] "[S]econd degree murder is first-degree murder minus premeditation . . . ." *People v. Oros*, 917 N.W.2d 559, 565 n.4 (Mich. 2018) (quoting *People v. Blevins*, 886 N.W.2d 456, 466 (Mich. App. 2016)).

First, that the defendant caused the death of [name deceased], that is, that [name deceased] died as a result of [state alleged act causing death].

Second, that the defendant had one of these three states of mind: [he / she] intended to kill, or [he / she] intended to do great bodily harm to [name deceased], or [he / she] knowingly created a very high risk of death or great bodily harm knowing that death or such harm would be the likely result of [his / her] actions.[8]

[Third, that the killing was not justified, excused, or done under circumstances that reduce it to a lesser crime.]4

\* \* \*

4 Paragraph (4) may be omitted if there is no evidence of justification or excuse, and the jury is not being instructed on manslaughter or any offense less than manslaughter. Justification or excuse instructions may be inserted here, but they are more commonly given at a later time.

Mich. Model Crim. Jury Instr. 16.5 (footnotes 2 and 3 omitted). And, where voluntary manslaughter is charged as a lesser included offense of murder, the instruction reads as follows:

The crime of murder may be reduced to voluntary manslaughter if the defendant acted out of passion or anger brought about by adequate cause and before the defendant had a reasonable time to calm down. For manslaughter, the following two things must be present:

First, when the defendant acted, [his / her] thinking must be disturbed by emotional excitement to the point that a reasonable person might have acted on impulse, without thinking twice, from passion instead of judgment. This emotional excitement must have been the result of something that would cause a reasonable person to act rashly or on impulse. The law does not say what things are enough to do this. That is for you to decide.

Second, the killing itself must result from this emotional excitement. The defendant must have acted before a reasonable time had passed to calm down and return to reason. The law does not say how much time is needed. That is for you to decide. The test is whether a reasonable time passed under the circumstances of this case.

---

8 The second "element" spells out the requirement of "malice" that exists in many common law definitions of murder. *People v. Abraham*, 662 N.W.2d 836, 841 (Mich. Ct. App. 2003) ("Second-degree murder is a general intent crime, which mandates proof that the killing was done with an intent to kill, an intent to inflict great bodily harm, or an intent to create a very high risk of death with the knowledge that the act probably will cause death or great bodily harm. . . . This concept is also known as malice." (internal quotation marks and citations omitted)).

Mich. Model Crim. Jury Instr. 16.9.[9]

"Manslaughter is murder without malice." *People v. Mendoza*, 664 N.W.2d 685, 689 (Mich. 2003). "[Malice] requires . . . the absence of any circumstance of justification, excuse, or recognized mitigation." *People v. Hansen*, 118 N.W.2d 422, 425 (Mich. 1962). Counsel attacked the malice element by presenting self-defense as a justification for the use of deadly force. *Riddle*, 649 N.W.2d at 34 (noting that the killing of another person in self-defense . . . is justifiable homicide"). Petitioner claims the better attack would have been through the mitigating circumstance of provocation. *People v. Darden*, 585 N.W.2d 27, 31 (Mich. App. 1998) (stating "a voluntary manslaughter conviction requires proof sufficient to sustain a conviction of second-degree murder, along with evidence of provocation as *a mitigating factor"*).

The justification defense of self-defense and the mitigation defense of provocation are not legally mutually exclusive.[10] As a practical matter, however, it is difficult to sell jurors on two seemingly inconsistent theories: one theory that a defendant made the rational determination that the circumstances justified the use of deadly force and another theory that Petitioner was provoked into such a rage that he was not acting rationally when he fired the shot. *See, e.g.*, *People v. Hall*, No. 273908, 2008 WL 4646116, at *7 (Mich. Ct. App. Oct. 21, 2008) (noting that "true self-defense does not constitute an unreasoned act with loss of control blurred by passion"); *People v.*

---

[9] Where the jury is instructed on voluntary manslaughter as an independent charge, rather than as a lesser included offense, the model instruction is essentially identical to the second-degree murder instruction. *Compare* Mich. Model Crim. Jury Instr. 16.5 *with* Mich. Model Crim. Jury Instr. 16.8; *see also People v. Thiengtham*, No. 361906, 2023 WL 8293491, at *4–5 (Mich. Ct. App. Nov. 30, 2023), *vacated, in part, on other grounds*, 4 N.W.3d 731 (Mich. 2024) (noting that the only difference between the two instructions is in the third requirement, the second-degree murder instruction states "Third, that the killing was not justified, excused, or done under circumstances that reduce it to a lesser crime" while the voluntary manslaughter instruction states "Third, that the defendant caused the death without lawful excuse or justification").

[10] *See, e.g.*, *People v. Tyburski*, 494 N.W.2d 20, 21 n.1 (Mich. Ct. App. 1992) (noting that counsel succeeded in presenting the seemingly incompatible defenses of heat of passion and self-defense).

*Valladolid*, Nos. 256738, 257546, 2005 WL 3078491, at *1 (Mich. Ct. App. Nov. 17, 2005) ("[Defendant] testified that he drew his gun and shot the victim out of self-defense; therefore, a claim that he acted after being provoked is inconsistent."); *People v. Magnus*, No. 191128, 1997 WL 33344922, at *2 (Mich. Ct. App. Aug. 26, 1997) (explaining that, "given that defendant's theory at trial was that the shooting was committed in self-defense, an instruction on involuntary manslaughter was not supported by the evidence"). Moreover, the benefits of success vary greatly between the two defenses. Successfully presenting a self-defense theory results in acquittal. Success on a provocation theory, on the other hand, means conviction of a lesser form of homicide with a shorter maximum sentence.

Whether counsel chose to defend on a justification theory, a mitigation theory, or both, it is clear that Petitioner is challenging counsel's decision on what arguments and evidence to present. Those are matters of trial management: "the lawyer's province." *McCoy*, 584 U.S. at 422. This is not about Petitioner's decision to plead guilty or maintain his innocence.

Petitioner's suggestion that counsel conceded the elements of second-degree murder when Petitioner wanted to go no further than conceding the elements of voluntary manslaughter is misleading. From a common-law perspective, "the distinction between murder and voluntary manslaughter is the element of malice . . . ." *People v. Yeager*, 999 N.W.2d 490, 497 (Mich. 2023). But that distinction does not find expression in the jury instructions. The second-degree murder instruction does not require the jury to find malice and the voluntary manslaughter instruction does not ask the jury to consider murder and then, if there is no malice, it is voluntary manslaughter. Rather, the voluntary manslaughter instruction starts with the proposition that the intentional killing is murder and permits a lesser sanction if the defendant "acted out of passion or anger brought about by adequate cause." Mich. Model Crim. Jury Instr. 16.9.

Thus, to profess a willingness to concede the elements of voluntary manslaughter is essentially the same as professing a willingness to concede the elements of second-degree murder. "Both murder and voluntary manslaughter 'require a death, caused by defendant, with either an intent to kill, an intent to commit great bodily harm, or an intent to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result.'" *Yeager*, 999 N.W.2d at 496 (quoting *Mendoza*, 664 N.W.2d at 692).

For all of these reasons, the Court concludes that counsel did not interfere with Petitioner's constitutionally guaranteed autonomy when counsel pursued a justification defense, self-defense, rather than a mitigation defense, provocation. Therefore, Petitioner is not entitled to habeas relief on habeas grounds I, II, or III.

### C.     Judicial Bias (Habeas Ground IV)[11]

Petitioner contends that his Sixth and Fourteenth Amendment rights were violated because he was tried before a biased judge. Petitioner points to the following examples of the trial judge's apparent bias: (1) the trial judge refused to allow Petitioner to directly address the court at different times during the trial, (Pet'r's Br., ECF No. 37, PageID.1268–1270, 1271–1273); and (2) the trial judge made biased comments at sentencing, (*Id.*, PageID.1270–1271).

Actual judicial bias amounts to structural error that is not susceptible to harmless error analysis. *See Washington v. Recuenco*, 548 U.S. 212, 218 n.2 (2006) (citing *Tumey v. Ohio*, 273 U.S. 510 (1927) (holding that a judge with a "direct, personal, substantial pecuniary interest in reaching a conclusion against [the criminal defendant] in his case" was constitutionally disqualified)); *see also Neder v. United States*, 527 U.S. 1, 8 (1999) (same); *Bracy v. Gramley*, 520 U.S. 899, 904–905 (1997) (stating that "the Due Process Clause clearly requires a 'fair trial in

---

[11] The state courts did not address this issue on the merits.

a fair tribunal,' before a judge with no **actual** bias against the defendant or interest in the outcome of his particular case." (citations omitted, emphasis added)). But many circumstances that lead a criminal defendant to question a judge's impartiality do not involve "actual bias:"

> [M]ost questions concerning a judge's qualifications to hear a case are not constitutional ones, because the Due Process Clause of the Fourteenth Amendment establishes a constitutional floor, not a uniform standard. *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 828, 106 S.Ct. 1580, 1588–1589, 89 L.Ed.2d 823 (1986). Instead, these questions are, in most cases, answered by common law, statute, or the professional standards of the bench and bar. *See, e.g., Aetna, id.*, at 820–821, 106 S.Ct., at 1584–1585; *Tumey v. Ohio*, 273 U.S. 510, 523, 47 S.Ct. 437, 441, 71 L.Ed. 749 (1927); 28 U.S.C. §§ 144, 455; ABA Code of Judicial Conduct, Canon 3C(1)(a) (1980)

*Bracy*, 520 U.S. at 904.

A judge's conduct at trial may be "characterized as 'bias' or 'prejudice'" only if "it is so extreme as to display clear inability to render fair judgment." *Liteky v. United States*, 510 U.S. 540, 551 (1994). However, because of the difficulty in determining "whether a judge harbors an actual, subjective bias," the courts look to "whether, as an objective matter, the average judge in [that judge's] position is likely to be neutral, or whether there is an unconstitutional potential for bias." *Williams v. Pennsylvania*, 579 U.S. 1, 9 (2016) (internal quotation marks omitted); *see also Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 883 (2009) ("The difficulties of inquiring into actual bias . . . simply underscore the need for objective rules.").

The Supreme Court has recognized constitutionally impermissible, objective indicia of bias in the following types of cases: (1) those cases in which the judge "has a direct, personal, substantial pecuniary interest in reaching a [particular] conclusion," *Tumey*, 273 U.S. at 523; (2) certain contempt cases, such as those in which the "judge becomes personally embroiled with the contemnor," *Offut v. United States*, 348 U.S. 11, 17 (1954); *see also Taylor v. Hayes*, 418 U.S. 488 (1974); and (3) cases in which a judge had prior involvement in the case as a prosecutor, *Williams*, 579 U.S. at 8. Beyond that, the courts indulge "a presumption of honesty and integrity

25

in those serving as adjudicators." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975). As the Sixth Circuit has noted:

> The presumption of impartiality stems not merely from the judicial-bias caselaw, *see* [*Withrow*], but from the more generally applicable presumption that judges know the law and apply it in making their decisions, *see Lambrix v. Singletary*, 520 U.S. 518, 532 n.4 (1997), and the even more generally applicable presumption of regularity, *see Parke v. Raley*, 506 U.S. 20, 30-31 (1992); *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14–15 (1926).

*Coley v. Bagley*, 706 F.3d 741, 751 (6th Cir. 2013).

Petitioner's bias claim does not implicate the indicia of bias set forth in *Tumey*, *Offut*, and *Williams*. Nothing in the record suggests that the trial judge had a pecuniary interest in Petitioner's case, that the trial judge became embroiled with Petitioner, and that the judge had prior involvement in the matter as a prosecutor. Rather, Petitioner appears to argue that the type of bias displayed by the trial judge is akin to the type of bias the Supreme Court defined in *Liteky*.

The petitioners in *Liteky* had been charged with willful destruction of United States property. *Id.* at 542. Prior to trial, they moved to disqualify the judge based upon "events that had occurred during and immediately after an earlier trial, involving petitioner Bourgeois, before the same District Judge." *Id.* Specifically, the petitioners argued that, during that earlier case,

> the judge had displayed "impatience, disregard for the defense and animosity" toward Bourgeois, Bourgeois' codefendants, and their beliefs. The alleged evidence of that included the following words and acts by the judge: stating at the outset of the trial that its purpose was to try a criminal case and not to provide a political forum; observing after Bourgeois' opening statement (which described the purpose of his protest) that the statement ought to have been directed toward the anticipated evidentiary showing; limiting defense counsel's cross-examination; questioning witnesses; periodically cautioning defense counsel to confine his questions to issues material to trial; similarly admonishing witnesses to keep answers responsive to actual questions directed to material issues; admonishing Bourgeois that closing argument was not a time for "making a speech" in a "political forum"; and giving Bourgeois what petitioners considered to be an excessive sentence. The final asserted ground for disqualification—and the one that counsel for petitioners described at oral argument as the most serious—was the judge's interruption of the closing argument of one of Bourgeois' codefendants, instructing him to cease the

26

introduction of new facts, and to restrict himself to discussion of evidence already presented.

*Id.* at 542–43.

The Supreme Court rejected the petitioners' arguments that the judge should have recused himself. In its analysis, the Court noted that "[t]he judge who presides at a trial may, upon completion of the evidence, be exceedingly ill disposed towards the defendant, who has been shown to be a thoroughly reprehensible person." *Id.* at 550–51. The Court cautioned, however, that "the judge is not thereby recusable for bias or prejudice, since his knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings, and are indeed sometimes (as in a bench trial) necessary to completion of the judge's task." *Id.* at 551. The Court then set forth the showing petitioners needed to make to succeed on a judicial bias claim:

> First, judicial rulings alone almost never constitute a valid basis for a bias or partiality motion. *See United States v. Grinnell Corp.*, 384 U.S. [563, 583 (1966)]. In and of themselves (*i.e.*, apart from surrounding comments or accompanying opinion), they cannot possibly show reliance upon an extrajudicial source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required (as discussed below) when no extrajudicial source is involved. Almost invariably, they are proper grounds for appeal, not for recusal. Second, opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible. An example of the latter (and perhaps of the former as well) is the statement that was alleged to have been made by the District Judge in *Berger v. United States*, 255 U.S. 22 (1921), a World War I espionage case against German-American defendants: "One must have a very judicial mind, indeed, not [to be] prejudiced against the German Americans" because their "hearts are reeking with disloyalty." *Id.*, at 28 (internal quotation marks omitted). *Not* establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display. A judge's ordinary efforts at

27

courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune.

*Liteky*, 510 U.S. at 555–556 (emphasis in original).[12] Overall, the Court concluded, the comments made by the judge during the prior proceeding did not "display[] deep-seated and unequivocal antagonism that would render fair judgment impossible." *Id.* at 556.

The Sixth Circuit has likewise noted that judicial bias may be established when "the judge's remarks clearly indicate a hostility to one of the parties, or an unwarranted prejudgment of the merits of the case, or an alignment on the part of the [c]ourt with one of the parties." *United States v. Blood*, 435 F.3d 612, 629 (6th Cir. 2006) (internal quotation marks and citations omitted). The Sixth Circuit has set forth the following considerations when analyzing a claim of judicial misconduct or bias: "(1) 'the nature of the issues at trial,' including how lengthy and complex the trial is; (2) 'the conduct of counsel,' and whether the attorneys are 'unprepared or obstreperous,'; and (3) 'the conduct of witnesses.'" *United States v. Smith*, 706 F. App'x 241, 254 (6th Cir. 2017) (quoting *United States v. Hickman*, 592 F.2d 931, 933 (6th Cir. 1979). Moreover, the Sixth Circuit "has considered the tone of the judicial interruptions, the extent to which they were directed at one side more than the other, and the presence of any curative instructions at the close of the proceedings." *McMillian v. Castro*, 405 F.3d 405, 410 (6th Cir. 2005).

None of the considerations noted by the Supreme Court or the Sixth Circuit demonstrate impermissible bias in Petitioner's case. Petitioner's contention that the trial judge's refusal to

---

[12] *Liteky* is a case that addresses the statutory recusal standard for federal judges. The Sixth Circuit has, nonetheless, relied on *Liteky* to provide the standard for assessing judicial bias claims under the Due Process Clause. *See Alley v. Bell*, 307 F.3d 380, 386 (6th Cir. 2002); *Lyell v. Renico*, 470 F.3d 1177, 1187 (6th Cir. 2006).

permit Petitioner to address court during trial directly evidences bias is based on the premise that Petitioner has a right to address the court directly during trial. That is simply not the case.

The Sixth Amendment affords Petitioner the right of self-representation or the right to counsel, but it does not "require a trial judge to permit 'hybrid' representation." *McKaskle v. Wiggins*, 465 U.S. 168, 183 (1984). The Sixth Circuit Court of Appeals has explained:

> Because Golson was represented by counsel before the district court, his legal arguments were required to be presented by his counsel. Allowing Golson to represent himself would have amounted to "hybrid representation," which is not permitted without leave of the court. *See Miller v. United States*, 561 F. App'x 485, 488 (6th Cir. 2014) (quoting *United States v. Mosely*, 810 F.2d 93, 97–98 (6th Cir. 1987)) (noting that a defendant "'has a constitutional right to be represented by *counsel or to represent himself during his criminal proceedings, but not both'"*) (emphasis in original).

*United States v. Golson*, 95 F.4th 456, 460 (6th Cir. 2024); see also *United States v. Cromer*, 389 F.3d 662, 681 n.12 (6th Cir. 2004) ("It is well settled that there is no constitutional right to hybrid representation."); *Ahmed v. Shoop*, Nos. 20-4153/21-3542/22-3309, 2024 WL 4342868, at *2 (6th Cir. Mar. 4, 2024) (noting that "a federal criminal defendant does not have the right to 'hybrid' representation whereby he would be able to file pro se motions while represented by appointed counsel" and collecting cases); *Alexander v. Brown*, No. 22-1871, 2023 WL 6378257, at *3 (6th Cir. Aug. 9, 2023) ("Both the Michigan appellate courts and the Supreme Court have held that there is no constitutional right to hybrid representation. [citations omitted]."). Therefore, the trial judge's refusal to permit Petitioner to directly address the court during trial does not evidence bias or prejudice.

Petitioner's contention that the trial judge's comments at sentencing evidence impermissible bias are likewise without merit. Before imposing sentence, the trial judge stated:

> All right. Mr. Walker, it is the obligation of the court when imposing sentence to consider punishment, the need to protect society, to individualize sentencing, as well as to deter similar offenses. The court has utilized the presentence report as advisory, including the sentence recommendation. The scoring of the guidelines,

which have been corrected on the record as stated. I've also taken into consideration the letter that you wrote to me, which I did receive and review, as well as statements by Ms. Cutts here today, Kenny's sister, as well as all the information that I've received, not only through the trial, but also through the various pleadings, and information that has comepending for quite some time.

Mr. Walker, all I can say is that you took the life of a promising young man; 16 years old, worked his way through high school, had a future. It was the most senseless -- I can even think of. You had every opportunity to turn around and walk away and you continued to go forward with this regardless of what version of the facts that you want to talk about, you went forward and pulled that gun out, and you killed that young man, Mr. Walker.

(Sentencing Tr.. ECF No. 41-16, PageID.2562–2563.) Petitioner contends that the judge's comments "indicated a predisposition or closed-minded posture, that he would sentence [Petitioner] as if an unprovoked killer no matter how much credible evidence of mitigating circumstances appeared in the record." (Pet'r's Br., ECF No. 37, PageID.1270–1271.) Petitioner's interpretation of the trial judge's comments is strained. A more likely interpretation would be that the judge was acknowledging that, whether the killing was premeditated (first-degree murder), intentional with malice (second-degree murder), or intentional but provoked (voluntary manslaughter), Petitioner intentionally killed the victim. It appears that, at the time, Petitioner interpreted the judge's comments that way, because his response was: "It was an accident your Honor[.] I didn't mean it. I'm not a killer." (*Id.*, PageID.1271.) Essentially, Petitioner was suggesting to the judge that the killing was not intentional at all; instead it was involuntary manslaughter—an entirely new theory of defense.

Because Petitioner has failed to show any evidence of impermissible bias, he is not entitled to habeas relief on this claim.

### D.     Ineffective Assistance of Trial Counsel Regarding the Voluntary Manslaughter Defense (Habeas Grounds VI and VII)

Petitioner claims that his counsel rendered ineffective assistance by failing to present the evidence referenced in statements ##140–170 of his petition to: (1) support the "voluntary

manslaughter concession strategy" rather than the self-defense strategy (habeas ground VI); and (2) support jury instructions on voluntary manslaughter rather than self-defense and second-degree murder (habeas ground VII). (2nd Am. Pet., ECF No. 36, PageID.1144.) Although this is a different presentation of the issue than Petitioner offered to the Michigan Court of Appeals, the argument still boils down to a claim that counsel pursued a self-defense strategy and Petitioner claims counsel should have pursued a voluntary manslaughter strategy. That is precisely the issue that the court of appeals resolved on the merits. Accordingly, the Court's analysis requires AEDPA deference.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. *Id.* at 687. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

31

Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential. *Harrington*, 562 U.S. at 105 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 571 U.S. 12, 15 (2013); *Cullen*, 563 U.S. at 190; *Premo v. Moore*, 562 U.S. 115, 122 (2011). In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740–41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA; it requires the petitioner not only to demonstrate the merit of his underlying *Strickland* claim, but also to demonstrate that 'there is no possibility fairminded jurists could disagree that the state court's decision [rejecting the *Strickland* claim] conflicts with this Court's precedents'" (quoting *Harrington*, 562 U.S. at 102)).

The Michigan Court of Appeals evaluated Petitioner's ineffective assistance claim under the following standard:

> Defendants have the guaranteed right to the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *People v. Aceval*, 282 Mich. App. 379, 386; 764 N.W.2d 285 (2009). Generally, to establish a claim of ineffective assistance, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and (2) there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different. *People v. Trakhenberg*, 493 Mich. 38, 51; 826 N.W.2d 136 (2012). However, such performance must be measured without the benefit of hindsight. *People v. LaVearn*, 448 Mich. 207, 216; 528 N.W.2d 721 (1995). Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise. *LeBlanc*, 465 Mich. at 578. (Mich. Ct. App. Op., ECF No. 21-23, PageID.2868.)

*Walker*, 2020 WL 1046699, at *2 (parallel federal citation omitted). The court of appeals specifically mentioned *Strickland* and, although the court of appeals cited state authority, the standard applied is identical to that set forth in *Strickland*. Indeed, *Trakhtenberg* identifies

32

*Strickland* as the source of the standard. *People v. Trakhtenberg*, 826 N.W.2d 136, 143 (Mich. 2012).

The state court's application of the correct standard eliminates the possibility that the resulting decision is "contrary to" clearly established federal law. As the Supreme Court stated in *Williams v. Taylor*:

> The word "contrary" is commonly understood to mean "diametrically different," "opposite in character or nature," or "mutually opposed." Webster's Third New International Dictionary 495 (1976). The text of § 2254(d)(1) therefore suggests that the state court's decision must be substantially different from the relevant precedent of this Court. The Fourth Circuit's interpretation of the "contrary to" clause accurately reflects this textual meaning. A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases.

*Williams v. Taylor*, 529 U.S. at 405. The Court went on to offer, as an example of something that is not "contrary to" clearly established federal law, the following:

> [A] run-of-the-mill state-court decision applying the correct legal rule from our cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s "contrary to" clause. Assume, for example, that a state-court decision on a prisoner's ineffective-assistance claim correctly identifies *Strickland* as the controlling legal authority and, applying that framework, rejects the prisoner's claim. Quite clearly, the state-court decision would be in accord with our decision in *Strickland* as to the legal prerequisites for establishing an ineffective-assistance claim, even assuming the federal court considering the prisoner's habeas application might reach a different result applying the *Strickland* framework itself. It is difficult, however, to describe such a run-of-the-mill state-court decision as "diametrically different" from, "opposite in character or nature" from, or "mutually opposed" to *Strickland*, our clearly established precedent. Although the state-court decision may be contrary to the federal court's conception of how *Strickland* ought to be applied in that particular case, the decision is not "mutually opposed" to *Strickland* itself.

*Id.* at 406. Because the Michigan Court of Appeals applied the correct standard, Petitioner can only overcome the deference afforded state court decisions if the court of appeals' conclusion regarding Petitioner's ineffective assistance claim is an unreasonable application of *Strickland* or

if the state court's resolution was based on an unreasonable determination of the facts. 28 U.S.C. 2254(d).

The Michigan Court of Appeals applied the standard as follows:

"A defendant in a criminal trial is entitled to have a properly instructed jury consider the evidence against him or her." *People v. Dobek*, 274 Mich. App. 58, 82; 732 N.W.2d 546 (2007). Defendant contends that his trial counsel should have requested a jury instruction on the lesser included offense of voluntary manslaughter because "[n]o sound trial strategy existed to not request" the instruction. However, this Court has long recognized that an "all or nothing" strategy may be reasonable. *See People v. Robinson*, 154 Mich. App. 92, 94; 397 N.W.2d 229 (1986) ("[T]he decision not to request lesser offenses was a matter of trial strategy."); *People v. Nickson*, 120 Mich. App. 681, 687; 327 N.W.2d 333 (1982) (holding that defense counsel was not ineffective in failing to request an instruction of a lesser-included instruction because "[t]he decision to proceed with an all or nothing defense is a legitimate trial strategy").

On appeal, defendant does not offer any argument to rebut the strong presumption that counsel employed reasonable strategy. *See People v. Carbin*, 463 Mich. 590, 600; 623 N.W.2d 884 (2001) ("[T]he defendant must overcome a strong presumption that counsel's performance constituted sound trial strategy."). Instead, he relies on the mere fact that the jury may have convicted him of manslaughter instead of murder had it been given that option, but that "fact" is not sufficient. *See LaVearn*, 448 Mich. at 216 (stating that counsel's performance is measured without the benefit of hindsight); *People v. Petri*, 279 Mich. App. 407, 412; 760 N.W.2d 882 (2008) ("A failed strategy does not constitute deficient performance."). In sum, defense counsel could have thought that the best chance for an acquittal was to not seek a manslaughter instruction, and this strategy is not objectively unreasonable from our review of the record.

*Walker*, 2020 WL 1046699, at *2.

Given the double deference owed to the court of appeals' conclusion, it is not for this Court to decide whether counsel's strategy was reasonable. Rather, this Court must determine "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105. The Court, therefore, must consider the court of appeals' assessment of trial counsel's action, not counsel's action itself.[13]

---

[13] Petitioner bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy and, therefore, can only prevail if he shows that the challenged

In *Keeble v. United States*, 412 U.S. 205 (1973), the Supreme Court explored the possible outcomes that might follow from giving—or failing to give—a lesser-included offense instruction. The *Keeble* Court acknowledged the potential benefit that Petitioner claims was denied to him at trial:

> [I]t is no answer to petitioner's demand for a jury instruction on a lesser offense to argue that a defendant may be better off without such an instruction. True, if the prosecution has not established beyond a reasonable doubt every element of the offense charged, and if no lesser offense instruction is offered, the jury must, as a theoretical matter, return a verdict of acquittal. But a defendant is entitled to a lesser offense instruction—in this context or any other—precisely because he should not be exposed to the substantial risk that the jury's practice will diverge from theory. Where one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of some offense, the jury is likely to resolve its doubts in favor of conviction. In the case before us, for example, an intent to commit serious bodily injury is a necessary element of the crime with which petitioner was charged, but not of the crime of simple assault. Since the nature of petitioner's intent was very much in dispute at trial, the jury could rationally have convicted him of simple assault if that option had been presented. But the jury was presented with only two options: convicting the defendant of assault with intent to commit great bodily injury, or acquitting him outright. We cannot say that the availability of a third option—convicting the defendant of simple assault—could not have resulted in a different verdict.

*Keeble*, 412 U.S. at 212–13; *see also Beck v. Alabama*, 447 U.S. 625, 634 (1980) (noting that "providing the jury with the 'third option' of convicting on a lesser included offense ensures that the jury will accord the defendant the full benefit of the reasonable-doubt standard").

The Sixth Circuit has considered similar claims from habeas petitioners in numerous opinions. For example, the Sixth Circuit has held that counsel was not ineffective for failing to request a lesser-included manslaughter instruction in a situation where the petitioner and defense counsel's primary defense theory was that the petitioner was not the one who shot the victim. *See*

---

action **cannot** be considered sound trial strategy. Thus, as the *Harrington* Court noted, "*Strickland* . . . calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." *Harrington*, 562 U.S. at 110. If the Michigan Court of Appeals conceived of a sound strategy that includes the challenged action, the matter is resolved.

*Tinsley v. Million*, 399 F.3d 796, 808 (6th Cir. 2005). The Sixth Circuit has also declined to find ineffective assistance of counsel where counsel's failure to request a lesser-included voluntary manslaughter instruction was consistent with the defendant's effort to seek a full acquittal on the basis of self-defense. *See Lewis v. Russell*, 42 F. App'x 809, 810–11 (6th Cir. 2002). Similarly, in *Edwards v. Mack*, the Sixth Circuit concluded that counsel was not ineffective for waiving jury instructions for lesser-included offenses where counsel and the defendant hoped to obtain an acquittal on the murder charge. *See Edwards v. Mack*, 4 F. App'x 215, 217–18 (6th Cir. 2001). Overall, the Sixth Circuit has concluded that such a "high risk, high reward" strategy is reasonable when there is sufficient evidence in the record to support a chance of acquittal. *See Kelly v. Lazaroff*, 846 F.3d 819, 830 (6th Cir. 2017); *see also Harrop v. Sheets*, 430 F. App'x 500, 507 (6th Cir. 2011) (discussing that counsel could have reasonably decided not to request a lesser offense instruction because such an instruction "would have diluted the other arguments [counsel] was advancing to the jury").

The evidence in the record supports a determination that Petitioner had a chance at acquittal on a theory of self-defense. There were two accounts of the incident: the account offered by Smith-Cole and the account offered by Petitioner. The accounts were irreconcilable. If the jurors accepted Smith-Cole's account, the killing was neither justified by self-defense nor mitigated by adequate provocation. If the jurors accepted Petitioner's account, Petitioner was being held in a headlock. He could not escape. The headlock, and according to Petitioner virtually any physical confrontation involving his head, had the potential of blinding him because of an eye condition. Fearful that his sight was at stake, Petitioner drew his weapon, spun around, and fired. The same provocation that might create the heat of passion that would mitigate Petitioner's action, also presents the risk of a serious injury that might justify the use of deadly force. Under those

circumstances, the record supported a chance of acquittal and pursuing that chance to the exclusion of allowing the jury to consider voluntary manslaughter is a legitimate strategy.

In sum, Petitioner's situation is similar to those presented in *Edwards*, *Kelly*, and *Harrop*, where the Sixth Circuit concluded that counsel was not ineffective for ***not*** requesting lesser-included offense instructions because the defendant hoped to obtain a complete acquittal. Petitioner has failed to show that the court of appeals' rejection of these claims of ineffective assistance was contrary to, or an unreasonable application of, *Strickland*. Accordingly, Petitioner is not entitled to habeas relief with respect to habeas grounds VI and VII.

### E.    Right to be Present (Habeas Ground IX)

Petitioner's claim that he was denied the right to be present at his trial is an echo of his argument regarding autonomy. The crux of the claim is that because Petitioner was not allowed to voice his position—as opposed to counsel voicing Petitioner's position—during the trial, particularly when counsel was supporting a second-degree murder instruction but not requesting a voluntary manslaughter instruction.

As a preliminary matter, Petitioner mischaracterizes counsel's position. First, counsel was not advocating for a second-degree murder instruction. Counsel moved for a directed verdict on the first-degree murder charge. (Trial Tr. IV, ECF No. 41-14, PageID.2321–2326.) He was arguing that there was no evidence of premeditation and, therefore, the trial court should direct a verdict of not guilty ***on that charge***. In the context of that argument, counsel acknowledged that the absence of evidence of premeditation would not warrant a directed verdict of not guilty with regard to the lesser included offense of second-degree murder. (*Id.*, PageID.2321.) That point is obvious in that premeditation is not an element of second-degree murder.

Petitioner has misinterpreted that argument as advocating for a second-degree murder instruction. In fact, the argument simply accepts that a second-degree murder instruction was

mandatory. In *People v. Jenkins*, the Michigan Supreme Court determined that "[b]ecause of the significant differences in the penalties between first-and second-degree murder, and because every charge of first-degree murder necessarily includes the lesser offense of second-degree murder, in every trial for first-degree murder, including felony murder, the trial court is required to instruct the jury Sua sponte, and even over objection, on the lesser included offense of second-degree murder." 236 N.W.2d 503, 504 (Mich. 1975). That very part of the *Jenkins* decision was overruled in *People v. Cornell*, 646 N.W.2d 127 (Mich. 2002). The *Cornell* court replaced the *Jenkins* mandate with the following:

> [W]e hold that a requested instruction on a necessarily included lesser offense is proper if the charged greater offense requires the jury to find a disputed factual element that is not part of the lesser included offense and a rational view of the evidence would support it. To permit otherwise would be inconsistent with the truth-seeking function of a trial, as expressed in M.C.L. § 768.29.[12] To the extent that our prior decisions, including *Jones*, *Chambliss*, *Stephens*, and *People v. Jenkins*, 395 Mich. 440, 236 N.W.2d 503 (1975) and their progeny conflict with our holding today, they are overruled.
>
> [12] MCL 768.29 states in pertinent part, "It shall be the duty of the judge to control all proceedings during the trial, and to limit the introduction of evidence and the argument of counsel to relevant and material matters, *with a view to the expeditious and effective ascertainment of the truth regarding the matters involved*." (Emphasis added.)

*Cornell*, 646 N.W.2d at 139–40 (footnotes 11, 13, and 14 omitted). The "overruling" of *Jenkins*, however, was not as complete as the above-quoted language suggests. With regard to first-degree murder and second-degree murder, the *Cornell* court also stated:

> *Jenkins* held that in a case involving a charge of first-degree murder, the trial court is always required to instruct the jury on the necessarily lesser-included offense of second-degree murder, even where such an instruction is not requested or is objected to. In light of our holding that a requested instruction on a necessarily included offense must be supported by the evidence, an instruction on second-degree murder, as a necessarily included lesser included offense of first-degree murder, is not automatically required. Rather, such an instruction will be proper if the intent element differentiating the two offenses is disputed and the evidence would support a conviction of second-degree murder. However, given that in many

cases involving first-degree murder, the intent element is disputed, we suspect that more often than not, an instruction on second-degree murder will be proper.

*Id.*, n. 13.

In Petitioner's case, he denied that the killing was premeditated or deliberate. Thus, the intent element was disputed. The second-degree murder instruction would have been given no matter what Petitioner's counsel argued.

But pointing out Petitioner's mischaracterization of the record does not resolve his right-to-be-present claim. Criminal defendants have a "fundamental righ[t]" "to personal presence at all critical stages of the trial." *Rushen v. Spain*, 464 U.S. 114, 117 (1983) (per curiam). But Plaintiff was present. Essentially, he complains that he was constructively denied the right to be present because the trial judge did not permit him to speak at certain times during the trial. The Court finds no support for the constitutional right Petitioner describes. Courts routinely disallow hybrid representation. *See supra* Section V.C. Accordingly, the Court concludes that Petitioner's claim regarding the right to be present is meritless.

### F. Failure to Give Voluntary Manslaughter Jury Instruction (Habeas Ground XI)

Petitioner has offered another challenge based on the jury instructions. He claims that he was entitled to an instruction on voluntary manslaughter and that he did not waive or forfeit his right to instruct the jury on that charge. Petitioner's challenge is a response to the Michigan Court of Appeals rejection of the claim on direct appeal. The appellate court concluded first that Petitioner had waived the challenge when counsel expressed his satisfaction with the instructions. *Walker*, 2020 WLZ 1046699, at *4. To the extent the challenge was not waived, the court concluded it was unpreserved and, thus, subject to only plain error review. *Id*. at *5. The court of appeals ultimately determined that the trial court was not required to sua sponte instruct the jury on manslaughter under state law. *Id*.

To the extent that Petitioner is challenging that state-law determination, state-law claims are not cognizable in habeas proceedings. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991). "[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005). So the Court cannot second guess the state court's determination, under its own law, that it need not give the voluntary manslaughter instruction to the jury.

Moreover, based on the state authority considered above, the reason for the appellate court's conclusion is apparent. *See supra* Section V.E. "[A] requested instruction on a necessarily included lesser offense is proper if the charged greater offense requires the jury to find a disputed factual element that is not part of the lesser included offense and a rational view of the evidence would support it." *Cornell*, 646 N.W.2d at 139. Here, however, the greater offense—second-degree murder—does not include a disputed factual element that is not a part of the lesser included offense.[14] Under *Cornell*, therefore, even if a rational view of the evidence would have supported giving a voluntary manslaughter instruction, it is not ***required*** under state law.

The Sixth Circuit Court of Appeals has held that, in non-capital cases, state courts are not constitutionally required to instruct the jury on lesser-included offenses, regardless of whether the instructions are supported by the evidence. *See Scott v. Elo*, 302 F.3d 598, 606 (6th Cir. 2002);

---

[14] As noted above, from a common-law perspective, "the distinction between murder and voluntary manslaughter is the element of malice . . . ." *People v. Yeager*, 999 N.W.2d 490, 497 (Mich. 2023). But that distinction does not find expression in the jury instructions. The second-degree murder instruction does not require the jury to find malice, and the voluntary manslaughter instruction does not ask the jury to consider murder and then, if there is no malice, it is voluntary manslaughter. Rather, the voluntary manslaughter instruction starts with the proposition that the intentional killing is murder and permits a lesser sanction if the defendant "acted out of passion or anger brought about by adequate cause." Mich. Model Crim. Jury Instr. 16.9. Thus, the jury instructions involve an additional element in the lesser offense, not the greater.

*Bagby v. Sowders*, 894 F.2d 792, 795–97 (6th Cir. 1990) (en banc).[15] Rather, such a claim warrants habeas relief only in the rare instance that "a fundamental miscarriage of justice is found to have resulted from the arbitrary and unsupportable denial of a lesser included offense instruction in clear defiance of state law." *Bagby*, 894 F.2d at 795. As noted above, the absence of the lesser included offense instruction here is entirely compliant with state law.

For all of these reasons, Petitioner is not entitled to habeas relief on his voluntary manslaughter instruction claim.

### G. Trial Counsel Failed to Object to the Scoring of Offense Variable 5 at 15 Points (Habeas Ground XIII)

Petitioner contends that trial counsel rendered ineffective assistance because counsel failed to object to the scoring of 15 points on Offense Variable 5 under the Michigan Sentencing Guidelines. Petitioner does not contend that the facts did not support that score; rather, he claims that only facts admitted by him or found by the jury could be used to score the variable under *Alleyne v. United States*, 570 U.S. 99, 103 (2013).

Petitioner's argument is founded upon a line of cases beginning with *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and including *Ring v. Arizona*, 53 U.S. 584 (2002), *Blakely v. Washington*, 542 U.S. 296 (2004), *United States v. Booker*, 543 U.S. 220 (2005), and *Alleyne*, 570 U.S. at 99. In *Apprendi*, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. *Apprendi* enunciated a new rule of Sixth Amendment jurisprudence. In the subsequent case of *Blakely*, the Court applied

---

[15] The Supreme Court has never held that due process requires a lesser-included-offense instruction in a non-capital case. *See Beck v. Alabama*, 447 U.S. 625, 638 n.14 (1980); *McMullan v. Booker*, 761 F.3d 662, 667 (6th Cir. 2014).

the rule of *Apprendi* to a state sentencing-guideline scheme, under which the maximum penalty could be increased by judicial fact-finding. The *Blakely* Court held that the state guideline scheme violated the Sixth and Fourteenth Amendments, reiterating the rule that any fact that increases the maximum sentence must be "admitted by the defendant or proved to a jury beyond a reasonable doubt." *See Booker*, 543 U.S. at 232 (citing *Blakely*, 542 U.S. at 303).

Subsequently, in *Alleyne*, 570 U.S. 99, the Supreme Court held that the *Blakely* line of cases applies equally to mandatory minimum sentences. In *People v. Lockridge*, 870 N.W.2d 502 (Mich. 2015), the Michigan Supreme Court held that, under *Alleyne*, the Michigan sentencing guidelines scheme violates the Sixth Amendment, because the "guidelines *require* judicial fact-finding beyond facts admitted by the defendant or found by the jury to score offense variables [] that *mandatorily* increase the floor of the guidelines minimum sentence range." *Lockridge*, 870 N.W.2d at 506 (emphasis in original). The Court's remedy for the unconstitutionality of the Michigan guidelines was to sever and strike the mandatory component of the guidelines and make the guidelines advisory only. *Id*. at 520–21 (relying on *Booker*, 543 U.S. at 264–265 and holding that the remedy for the unconstitutionality of the mandatory federal sentencing guidelines was to sever only the mandatory component, still requiring courts to consider the guidelines, but making them advisory and subject to review for reasonableness).

On August 24, 2018, the Sixth Circuit agreed with the *Lockridge* analysis. *Robinson v. Woods*, 901 F.3d 710 (6th Cir. 2018). The *Robinson* court held that the Supreme Court's decision in *Alleyne* clearly established that Michigan's mandatory minimum sentencing scheme was unconstitutional. *Robinson*, 901 F.3d at 714. The court reasoned that, "[a]t bottom, Michigan's sentencing regime violated *Alleyne*'s prohibition on the use of judge-found facts to increase mandatory minimum sentences. *Id*. at 716 (citing *Alleyne*, 570 U.S. at 111–12).

But Petitioner was sentenced well after the *Alleyne* and *Lockridge* decisions. At the time Petitioner was sentenced, the guidelines were advisory, not mandatory. Purely advisory applications of the guidelines do not run afoul of the Sixth Amendment. *See Booker*, 543 U.S. at 232 ("If the Guidelines as currently written could be read as merely advisory provisions that recommended, rather than required, the selection of particular sentences in response to differing sets of facts, their use would not implicate the Sixth Amendment. We have never doubted the authority of a judge to exercise broad discretion in imposing a sentence within a statutory range."); *see also Apprendi,* 530 U.S. at 481–82 (reiterating that "a sentence imposed by a federal district judge, *if within statutory limits,* is generally not subject to review" (emphasis added) (quoting *Tucker*, 404 U.S. at 447)); *see also Reign v. Gidley*, 929 F.3d 777, 781 (6th Cir. 2019) ("But the constitutional error here was the mandatory application of the guidelines, not merely the consideration of judge-found facts.")

Petitioner's contention that his sentence was based on judge-found facts, therefore, is of no meaningful significance. Any objection on that ground would have been meritless. Counsel is "not required to raise meritless arguments to avoid a charge of ineffective assistance of counsel." *Ludwig v. United States*, 162 F.3d 456, 459 (6th Cir. 1998); *see also Coley*, 706 F.3d at 752 (noting that "[o]mitting meritless arguments is neither professionally unreasonable nor prejudicial"). Therefore, Petitioner is not entitled to habeas relief on this claim.

### H.    Ineffective Assistance of Appellate Counsel (Habeas Grounds V, VIII, X, XII, and XIV)

Finally, Petitioner contends that his appellate counsel rendered ineffective assistance for failing to raise habeas grounds I, II, III, VI, VII, IX, XI, and XIII on direct appeal. The *Strickland* standard that applies to trial counsel also applies to appellate counsel. However, a criminal appellant has no constitutional right to have every non-frivolous issue raised on appeal. Rather,

"'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751–52 (1983)). To require appellate counsel to raise every possible colorable issue "would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Strickland*, 466 U.S. at 688. As the Supreme Court has observed, it is difficult to demonstrate that an appellate attorney has violated the performance prong where the attorney presents one argument on appeal rather than another. *Smith v. Robbins*, 528 U.S. 259, 289 (2000). In such cases, the petitioner must demonstrate that the issue not presented "was clearly stronger than issues that counsel did present." *Id*.

In Petitioner's case, however, as set forth fully above, all of the issues Petitioner claims appellate counsel should have raised lack merit. "Appellate counsel cannot be found to be ineffective for 'failure to raise an issue that lacks merit.'" *Shaneberger v. Jones*, 615 F.3d 448, 452 (6th Cir. 2010). (quoting *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001)); *see also Coley*, 706 F.3d at 752). Accordingly, Petitioner is not entitled to habeas relief on these claims.

## VI.    Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001) (per curiam). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467.

Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

The Court finds that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims was debatable or wrong. Therefore, the Court will deny Petitioner a certificate of appealability. Moreover, although Petitioner has failed to demonstrate that he is in custody in violation of the Constitution and has failed to make a substantial showing of the denial of a constitutional right, the Court does not conclude that any issue Petitioner might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

## Conclusion

The Court will enter a judgment dismissing the petition and an order resolving the pending motions and denying a certificate of appealability.

Dated: February 14, 2025                          /s/ Hala Y. Jarbou
                                                  HALA Y. JARBOU
                                                  CHIEF UNITED STATES DISTRICT JUDGE